## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD BLAIR MENCHYK,    )
                                )
          Plaintiff,     )
                                )     Civil Action No. 10-1260
        v.             )
                                )     Judge Joy Flowers Conti
MICHAEL J. ASTRUE,      )     Magistrate Judge Maureen P. Kelly
Commissioner of Social Security,   )
                                )
         Defendant.    )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

## II. REPORT

### A. BACKGROUND

#### 1. General

Richard Blair Menchyk ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). Plaintiff filed for benefits on June 23, 2008,

claiming an inability to work as of September 15, 2006 due to disability resulting from alleged depression, anxiety, and minor physical ailments. (R. at 113 – 26, 135 – 41).[1] This matter comes before the court on cross motions for summary judgment. (ECF Nos. 7, 13).

Plaintiff was born on November 8, 1984, and was twenty-three years of age[2] at the time of his application for benefits. (R. at 113 – 126). Plaintiff lived in an apartment with his father. (R. at 178). Plaintiff completed high school and attended community college for two years, although, he failed to obtain a degree. (R. at 235 – 37). Plaintiff's most recent employment was as a subcontractor for T.W. Phillips Gas and Oil. (R. at 235 – 37). His responsibilities over four and a half years included driving a truck, digging ditches, and laying pipe. (R. at 235 – 37).

Since his alleged disability onset date, Plaintiff had accumulated a number of charges of criminal offenses, which included: drug possession with intent to deliver in Armstrong County, Pennsylvania, for which Plaintiff was arrested and served one year of probation in 2003; forgery, bounced checks, theft by unlawful taking, and failure to appear at a court hearing in 2007 in Butler County, Pennsylvania, for which Plaintiff was incarcerated in 2007; forgery in 2008, for which Plaintiff served time in Butler County prison; a drug possession charge in Allegheny County, Pennsylvania in 2008, for which Plaintiff was also incarcerated; and drug dealing and forgery charges in 2009 for which Plaintiff was incarcerated in Butler County for eleven months and placed on four years of probation upon release. (R. at 197, 204, 235 – 37, 289).

In a self-report of daily functioning, Plaintiff indicated that a typical day included regular appointments at a methadone clinic and with a counselor. (R. at 178). Plaintiff was responsible for taking his medication. (R. at 178). He had no problems with his personal care, and cooked daily for half an hour at a time. (R. at 179 – 80). Plaintiff cleaned and performed household

---

[1]    Citations to ECF Nos. 4 – 4-7, the Record, *hereinafter*, "R. at __."

[2]    Plaintiff is defined as a, "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

chores regularly, but claimed to need reminders.  (R. at 180).  Plaintiff went out every day, independently, and could walk, drive, ride in a vehicle with others, and take public transit.  (R. at 181).  He shopped for clothing or groceries approximately twice per week for several hours at a time.  (R. at 181).  Plaintiff claimed to be capable of handling bills, savings, and a checkbook.  (R. at 181).  He included camping, movies, shopping, spending time with others, and going to the community center/church among his hobbies.  (R. at 182).  He has not camped since his alleged disability onset, but engages in his other hobbies without significant problems on a weekly basis.  (R. at 182).  Plaintiff indicated that he had no trouble getting along with family, friends, neighbors, authority figures, or other people generally.  (R. at 183 – 84).

Plaintiff claimed that since his disability onset, he lacked motivation, and experienced back and neck pain which prevented him from lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing, and completing tasks for extended periods.  (R. at 183).  Plaintiff could, however, walk up to one mile at a time, requiring a ten minute rest before continuing.  (R. at 183).  He could pay attention for a "few hours," follow written instructions "very well," and his ability to follow spoken instructions was "good."  (R. at 183).  His ability to handle stress was "good enough," and he had an "ok" ability to handle changes in routine.  (R. at 184).  Plaintiff noted that he had no unusual behaviors or fears.  (R. at 184).

### 2.  Medical History

Plaintiff received psychiatric care during his periods of incarceration, beginning in 2007 while at the Butler County prison.  On April 11, 2007, Plaintiff complained that he was shaky and anxious, and requested medication to calm him and help him to sleep.  (R. at 196).  Prison medical staff indicated that Plaintiff had prior stints in drug and alcohol treatment programs in 2005 and 2006.  (R. at 196).  It was reported that Plaintiff abused alcohol, heroin, cocaine,

marijuana, and MDMA[3]. (R. at 196). Plaintiff was found to be cooperative, he made good eye contact, he had organized and goal-directed thoughts, he exhibited fair insight and judgment, and he had a good overall mental status. (R. at 196). Plaintiff denied homicidal or suicidal ideation, but was observed to be irritable and anxious. (R. at 196).

In an April 13, 2007 psychiatric note at Butler prison, Plaintiff was noted to be taking psychiatric medications for his mood and anxiety. (R. at 197). His history of non-compliance with medication therapy prior to his incarceration was noted. (R. at 197). Plaintiff's anxiety was observed to have resolved after being moved from a pod in the prison in which he had felt uncomfortable with some of the other inmates. (R. at 197). Thereafter, Plaintiff exhibited no signs of mania or psychosis, he denied hopelessness, obsessions, delusions, hallucinations, and suicidal ideation, his mood was good, he was cooperative, he made good eye contact, his motor activity was normal, his speech was normal, his thoughts were organized, and his insight and judgment were fair. (R. at 197). Plaintiff was diagnosed with substance induced mood disorder, alcohol dependence, and opioid dependence. (R. at 197).

Plaintiff was treated at the Irene Stacy Community Health Center ("Health Center"), following his release from Butler prison in April of 2007. (R. at 199 – 204). At intake, Plaintiff reported feeling depressed on a daily basis. (R. at 199 – 204). He stated that his history of substance abuse exacerbated his psychological issues. (R. at 199 – 204). Plaintiff described losing interest in activities, inability to focus or concentrate, irritability, anxiety, racing thoughts, and low self-esteem. (R. at 199 – 204). Plaintiff claimed to have difficulty sleeping and eating healthily. (R. at 199 – 204). Several drug treatment programs in which Plaintiff had participated

---

[3]     MDMA, also known as "Ecstasy," "is a synthetic, psychoactive drug that is chemically similar to the stimulant methamphetamine and the hallucinogen mescaline. MDMA produces feelings of increased energy, euphoria, emotional warmth, and distortions in time, perception, and tactile experiences." National Institutes of Health, National Institute on Drug Abuse, http://www.drugabuse.gov/infofacts/ecstasy.html (last visited November 8, 2011).

in the past had failed to provide lasting results. (R. at 199 – 204). He believed this was attributable to the lack of adequate counseling regarding underlying mental and emotional difficulties. (R. at 199 – 204). Plaintiff was not suicidal, and was diagnosed with major depressive disorder. (R. at 199 – 204). Plaintiff admitted to abusing alcohol, marijuana, heroin, and Oxycontin. (R. at 199 – 204).

Plaintiff was discharged from the Health Center on August 3, 2007, due to non-compliance. (R. at 199). At intake, his global assessment of functioning[4] ("GAF") score was 35. (R. at 199). His discharge GAF score was 40. (R. at 199). He was diagnosed with major depressive disorder. (R. at 199). He was noted as requiring further treatment, but kept only one of his five scheduled appointments and made no effort to reschedule. (R. at 199).

During a second period of incarceration at Butler prison, Plaintiff again received psychiatric treatment. On November 9, 2007, Plaintiff presented complaining of depression and anxiety. (R. at 219). His past drug and alcohol abuse were noted. (R. at 219). He was not suicidal. (R. at 219). Plaintiff was continued on psychiatric medications. (R. at 219). Plaintiff was seen again on January 7, 2008, and was considered to be suffering from anxiety and substance induced mood disorder. (R. at 220). Plaintiff was not suicidal, and had no acute complaints. (R. at 220).

---

[4]     **Error! Main Document Only.**The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

When Plaintiff was transferred for incarceration in Allegheny County, he was assessed by correctional health services on April 4, 2008. (R. at 223). His substance abuse history was noted. (R. at 224). Plaintiff was described as clean, polite, cooperative, and alert/ oriented. (R. at 225). Upon release from Allegheny County, Plaintiff returned to the Health Center for treatment on April 21. (R. at 263 – 66). At intake, Plaintiff's GAF score was 45. (R. at 263 – 66). He was diagnosed with major depressive disorder and polysubstance dependence. (R. at 263 – 66).

Plaintiff attended regular medication checks at the Health Center. He typically noted his mood to be between seven and eight on a scale of ten. (R. at 263 – 66). His mood and sleep improved over time. (R. at 263 – 66). He was also on methadone maintenance and was attending counseling. (R. at 263 – 66). While at the Health Center, Plaintiff received a psychiatric evaluation by Randon Simmons, M.D. (R. at 235 – 37). Plaintiff denied experiencing suicidal ideation, hallucinations, or delusions. (R. at 235 – 37). He considered his mood to be "six" on a scale of one to ten. (R. at 235 – 37). Plaintiff reported that his appetite was good, that he rarely experienced difficulty when consistently taking his medication, that he slept six to eight hours a night, that he had the energy to complete tasks, but was not motivated, that he was not easily irritable, and that he experienced racing thoughts when alone. (R. at 235 – 37). Plaintiff reported that he failed to take his medications consistently, even though they worked "very well," allowed him to feel the "best he had ever felt," and "helped to keep him level." (R. at 235 – 37).

Dr. Simmons noted that Plaintiff had an extensive substance abuse history. (R. at 235 – 37). He indicated that Plaintiff had been through a number of rehabilitation programs, but failed to follow through with recommended continuing treatment upon discharge from the programs.

(R. at 235 – 37). Plaintiff was late for his evaluation, but was dressed neatly. He was alert and oriented, pleasant, and cooperative. (R. at 235 – 37). His speech was normal, he exhibited no abnormal motor activities, his mood was dysphoric, he was anxious, his affect was broad, he was goal-directed, his memory was intact, and his judgment and insight were good. (R. at 235 – 37). Based upon his observations, Dr. Simmons believed that Plaintiff was experiencing a positive response to his medication regimen. (R. at 235 – 37). Plaintiff was diagnosed with major depressive disorder without psychotic features and polysubstance dependence in early partial remission, and was assessed a GAF score of 45. (R. at 235 – 37). Dr. Simmons also signed a Pennsylvania Department of Public Welfare Employability Assessment Form, indicating that Plaitniff was temporarily disabled from all work beginning May 5, 2008 and ending November 5, 2008, due to major depressive disorder and polysubstance dependence in remission. (R. at 259).

Plaintiff was seen by Dennis Demby, M.D. at Butler Medical Associates in Butler, Pennsylvania on May 23, 2008. (R. at 229 – 32). Plaintiff complained of knee, ankle, and tooth pain, and requested narcotic medication for treatment. (R. at 229 – 32). Plaintiff also complained of anxiety, difficulty sleeping, migraine headaches, and constipation. (R. at 229 – 32). He was noted to be taking prescription Remeron and Abilify. (R. at 229 – 32). Dr. Demby observed Plaintiff to be in no acute distress, without joint deformity or swelling, and that he was alert and oriented. (R. at 229 – 32). Dr. Demby prescribed only amoxicillin for a broken tooth. (R. at 229 – 32).

Two days later, on May 25, 2008, Plaintiff was seen by orthopedic surgeon D. Kelly Agnew, M.D. (R. at 255 – 56). Plaintiff presented with vague complaints of medial and lateral ankle discomfort. (R. at 255 – 56). His greatest pain was under his plantar heel. (R. at 255 –

56).  Dr. Agnew opined that Plaintiff expressed a great deal of interest in receiving prescription pain medication, and indicated that he specifically requested Fentanyl[5].  (R. at 255 – 56).  Dr. Agnew found no numbness, tingling, or nerve root pain.  (R. at 255 – 56).  Dr. Agnew also reported that Plaintiff made no mention of his history of anxiety or depression.  (R. at 255 – 56).  On physical examination, aside from vague pain unassociated with any specific anatomical structure, Plaintiff was normal.  (R. at 255 – 56).  Diagnostic imaging revealed no abnormalities.  (R. at 255 – 56).  Dr. Agnew diagnosed Plantar Fasciitis[6].  (R. at 255 – 56).  Plaintiff was given trial doses of Feldene[7], but Dr. Agnew stated that he would not provide Plaintiff with narcotics, and "certainly will not provide a Fentanyl patch."  (R. at 255 – 56).

On July 5, 2008, Plaintiff returned to the Health Center for a medication evaluation.  (R. at 234).  His mood was his only noted problem.  (R. at 234).  Plaintiff stated that he was "doing pretty good" on his medications.  (R. at 234).  He felt that a recent increase in dosage was helpful.  (R. at 234).

Plaintiff was seen by Dr. Demby on August 7, 2008 for complaints of neck pain following a car accident.  (R. at 294).  Plaintiff had received Lortab[8] while at a hospital subsequent to his accident to treat his pain.  (R. at 294).  Plaintiff requested more Lortab.  (R. at 294).  Plaintiff also informed Dr. Demby that he was on methadone maintenance.  (R. at 294).

---

[5]     Fentanyl "is a powerful synthetic opiate analgesic similar to but more potent than morphine.  It is typically used to treat patients with severe pain after surgery."  National Institutes of Health, National Institute on Drug Abuse, http://drugabuse.gov/drugpages/fentanyl.html (last visited November 8, 2011).

[6]     Plantar Fasciitis is "inflammation of the thick tissue on the bottom of the foot.  This tissue is called the plantar fascia.  It connects the heel bone to the toes and creates the arch of the foot."  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004438/ (last visited November 8, 2011).

[7]     Feldene is a non-steroidal anti-inflammatory medication.  WebMD, http://www.webmd.com/drugs/drug-10963-Feldene+Oral.aspx?drugid=10963&drugname=Feldene+Oral (last visited November 8, 2011).

[8]     Lortab is a prescription pain killer consisting of a combination of the narcotic analgesic hydrocodone and another non-narcotic analgesic.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000014/ (last visited November 8, 2011).

Dr. Demby indicated that it was unusual for Lortab to be given to an individual on methadone, and declined to provide Plaintiff with the drug. (R. at 294). Dr. Demby indicated that he had not been told about Plaintiff's ongoing methadone treatment until that day. (R. at 294).

Upon examination, Dr. Dermby concluded that Plaintiff's neck pain did not radiate down his arms. (R. at 294). Further, although any direct attempt to move Plaintiff's neck allegedly gave him significant pain, Plaintiff freely moved his neck when Dr. Demby was not overtly examining him. (R. at 294). Plaintiff was diagnosed with neck strain and advised to engage in physical therapy. (R. at 294). Plaintiff also claimed he was not urinating frequently enough, but Dr. Demby found no evidence of fluid retention. (R. at 294).

A mental residual functional capacity ("RFC") assessment of Plaintiff was completed by state agency evaluator Douglas Schiller, Ph.D. on August 15, 2008. (R. at 238 – 40). Based upon his review of the medical record, Dr. Schiller diagnosed Plaintiff with affective disorders and substance addiction disorders. (R. at 238 – 40). He found Plaintiff to be moderately to not significantly limited in all areas of functional ability. (R. at 238 – 40). He noted Plaintiff's complaints of depression, arthritis, and migraines, but concluded that Plaintiff was only partially credible. (R. at 238 – 40). He noted that Plaintiff's memory was intact, and that his activities of daily living and social skills were functional. (R. at 238 – 40). Plaintiff was determined to be capable of carrying out short, simple instructions, functioning in production oriented jobs requiring independent decision making, and generally maintaining competitive, full-time employment. (R. at 238 – 40).

On September 9, 2008, Dr. Simmons again completed a Pennsylvania Department of Public Welfare Employability Assessment Form indicating that Plaintiff was temporarily disabled from all work beginning September 10, 2008 and ending May 10, 2009, due to

recurrent, severe major depressive disorder without psychotic features and polysubstance dependence in early partial remission. (R. at 262).

Plaintiff was evaluated by psychiatrist Robert Eisler, M.D. on August 5, 2009. (R. at 289 – 92). Plaintiff was on-time for his appointment, was personable, polite, and cooperative, and appeared to be intelligent. (R. at 289 – 92). Plaintiff described a history of drug abuse which included the use of Vicodin, Oxycontin, and heroin. (R. at 289 – 92). Dr. Eisler noted that Plaintiff had been abusing heroin while in a methadone maintenance program, and that he had attended Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") with minimal participation, and that past efforts at rehabilitation had failed. (R. at 289 – 92). Plaintiff claimed to be depressed as a youth. (R. at 289 – 92). He further claimed to feel worthless and burdened, to be unable to sleep, to isolate himself, to feel weak, to suffer headaches, to contemplate suicide, to hear voices and noises, and to feel paranoid. (R. at 289 – 92). Dr. Eisler considered these complaints to be indicative of severe, chronic major depressive disorder with psychosis. (R. at 289 – 92).

Testing showed that Plaintiff remembered four out of four memory words, was alert and oriented, could name numerous presidents, could identify directions on a compass, did reasonably well naming and placing foreign cities, could name the state's governor, and repeated a seven digit number. (R. at 289 – 92). However, based upon his evaluation of Plaintiff, Dr. Eisler found that Plaintiff had poor or no ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, understand, remember, and carry out detailed or complex job instructions, relate predictably in social situations, or demonstrate reliability. (R. at 289 – 92). Dr. Eisler found Plaintiff's functioning to be fair or good in all other respects. (R.

at 289 – 92). Dr. Eisler ultimately concluded that Plaintiff would be incapable of working for at least one full year. (R. at 289 – 92).

Following another incarceration in the Butler County prison, Plaintiff was seen by Dr. Simmons on August 13, 2009. (R. at 299 – 301). Plaintiff complained of trouble sleeping, depression, anxiety, and low energy when not taking his medication. (R. at 299 – 301). He exhibited no psychotic symptoms or suicidal ideation. (R. at 299 – 301). When on his medication, Plaintiff stated that he felt normal. (R. at 299 – 301). Plaintiff was calm and pleasant, exhibited no agitation, irritability, or distractibility, had intact memory, recall, and orientation, made good eye contact, and exhibited good insight and judgment. (R. at 299 – 301). Plaintiff was noted to have recently begun attending AA and NA meetings with regular frequency. (R. at 299 – 301). Plaintiff was diagnosed with mood disorder, polysubstance dependence in remission, and antisocial personality disorder. (R. at 299 – 301).

On December 22, 2009, Dr. Simmons completed another Employability Assessment Form, indicating that Plaintiff was temporarily disabled from all employment, beginning in August of 2009 and ending in April of 2010, due to mood disorder and polysubstance dependence. (R. at 302 – 04).

### 3. Administrative Hearing

Plaintiff did not appear at his administrative hearing. There was some confusion regarding Plaintiff's means of transportation to the hearing. (R. at 49 – 51). The ALJ delayed the start of the hearing in an attempt to give Plaintiff more time to appear, but ultimately denied a formal request for postponement, and began and concluded the hearing without Plaintiff. (R. at 51). Aside from the admission of Plaintiff's medical records as exhibits, little evidence was presented at the hearing. Plaintiff's counsel mentioned that the record did provide evidence of

impairment related to ankle problems, arthritis, and migraine headaches.  (R. at 51).  However, counsel admitted that Plaintiff's psychiatric condition was his primary impairment.  (R. at 52).

The ALJ began the hearing by asking the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience could perform a significant number of jobs in the national economy if limited to medium exertional work not requiring the use of ladders, ropes, scaffolds, or foot controls, not involving exposure to fumes, odors, dust, gases, poor ventilation, workplace hazards, alcohol, or prescription drugs, and limited to simple, one or two-step, routine procedures, with limited interaction with supervisors, co-workers, and the public, and no occupational driving.  (R. at 52 – 53).

The vocational expert replied that a person with such limitations would be capable of engaging in "hand working occupations," with 67,000 such positions available in the national economy, "hand packers" occupations, with 330,000 positions available, and "bench assembly," with 308,000 positions available.  (R. at 53).  The ALJ asked whether the availability of these positions would change if the hypothetical person could not be around loud noises.  (R. at 53). The vocational expert stated that the availability of the aforementioned jobs would not be affected.  (R. at 53 – 54).

Plaintiff's attorney asked the vocational expert whether the hypothetical individual could perform any work if he or she had poor or no ability to deal with work stresses.  (R. at 54).  The vocational expert explained that the discussed positions involved little stress, and would likely be available to a person so limited.  (R. at 54).  Plaintiff's attorney then asked whether jobs would be available to the hypothetical person if he or she were unreliable – unable to get to or stay at work for up to fifteen percent of scheduled work time.  (R. at 54).  The ALJ opined that no jobs would be available to such a person.  (R. at 55).  Generally, only one absence per month would

be tolerated.  (R. at 55).  Plaintiff's attorney concluded by asking whether jobs would be available to the hypothetical person if his or her maintenance on methadone were made known to an employer.  (R. at 56).  The vocational expert believed that the aforementioned job numbers would likely be reduced by two-thirds, in such a case.  (R. at 56 – 57).

After consideration of the hearing testimony and Plaintiff's accompanying medical records, the ALJ determined that Plaintiff suffered medically determinable severe impairments in the way of major depressive disorder, anxiety, substance abuse disorder, substance induced mood disorder, plantar fasciitis, and migraine headache.  (R. at 18).  Despite his limitations, Plaintiff was found capable of medium exertional work except that he could not use ladders, ropes, or scaffolds, could not use foot controls on his right side, must avoid flames, odors, dusts, gases, and poorly ventilated areas, must avoid workplace hazards, could not perform occupational driving, could not be required to do more than simple, one-to-two step routine, low stress procedures, could not work in an environment wherein the manufacture, packaging, advertising, or shipping of alcohol or controlled substances of any kind occurred, and must have only limited and superficial interaction with supervisors, co-workers, and the general public.  (R. at 19).

## B.    ANALYSIS

### 1. Standard of Review

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[9] and 1383(c)(3)[10]. Section 405(g) permits a district court to review

---

[9]    Section 405(g) provides in pertinent part:

Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a

the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable

---

civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[10]     Section 1383(c)(3) provides in pertinent part:
The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

regulatory interpretations that an agency manifests in the course of making such findings."

*Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for Social Security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

### 2. Discussion

Based upon the testimony of the vocational expert, the ALJ concluded that even with his aforementioned limitations, Plaintiff was capable of engaging in a significant number of jobs in the national economy, and was, therefore, ineligible for benefits as of his claimed disability onset date. (R. at 22 – 23). Plaintiff objects to the determination of the ALJ, arguing that the ALJ erred in failing to postpone the hearing in light of good cause for Plaintiff's absence, in failing to properly account for and weigh medical evidence on the record, and in failing to rely upon an accurate hypothetical and RFC assessment. (ECF No. 8 at 9 – 17).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was

proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

### a. Objection as to Alleged Due Process Violation

Initially, Plaintiff raises what appears to be an alleged procedural due process violation with respect to the ALJ's failure to find that Plaintiff provided good cause for missing his administrative hearing and, thereafter, to hold a supplemental hearing. (ECF No. 8 at 9 – 14). Plaintiff's argument is unavailing for a number of reasons. It has been established that in order to state a procedural due process claim, a plaintiff must make two showings: first, there must be a deprivation of a protected interest; second, there must have been some process that was due. *Bridgeforth v. American Education Services*, 412 Fed. App'x 433, 435 – 36 (3d Cir. 2011) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)). Plaintiff fails to establish the first prong explicitly. However, even assuming that Plaintiff had a protected interest, he also fails to show that he was denied the process to which he was allegedly entitled.

20 C.F.R. §§ 404.957, 416.1457 provide that an ALJ may dismiss an claimant's request for a hearing if the claimant fails to attend a properly noticed hearing at the scheduled time, and fails to provide "good cause" for his or her failure to attend. 20 C.F.R. §§ 404.911, 416.1411[11]

---

[11]     Sections 404.911 and 416.1411 state:

(a) In determining whether you have shown that you had good cause for missing a deadline to request review we consider--
>    (1) What circumstances kept you from making the request on time;
>    (2) Whether our action misled you;
>    (3) Whether you did not understand the requirements of the Act resulting from amendments to the Act, other legislation, or court decisions; and
>    (4) Whether you had any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) which prevented you from filing a timely request or from understanding or knowing about the need to file a timely request for review.

(b) Examples of circumstances where good cause may exist include, but are not limited to, the following situations:

indicate how an ALJ should go about determining whether a claimant has provided good cause. In the present case, while Plaintiff failed to appear for his hearing, his representative did appear. In such a case, non-binding administrative guidelines utilized by the SSA instruct that the ALJ should proceed with the hearing and, upon submission of alleged good cause[12] for failure to appear, determine whether a supplemental hearing should be held to allow the claimant to testify, or whether the claimant should be considered to have constructively waived his right to appear. Hearings, Appeals and Litigation Law Manual ("HALLEX") I-2-4-25D[13]. *See Hitchcock v. Comm'r of Soc. Sec.*, 2009 WL 5178806 *10 (W.D. Pa. Dec. 21, 2009) (citing *Edelman v. Comm'r of Soc. Sec.*, 83 F. 3d 68, 71 n. 2 (3d Cir. 1996)) ("HALLEX is an internal guidance tool and has no legal force."). Here, the ALJ so proceeded. The ALJ even gave Plaintiff additional time to arrive at the hearing.

---

(1) You were seriously ill and were prevented from contacting us in person, in writing, or through a friend, relative, or other person.
(2) There was a death or serious illness in your immediate family.
(3) Important records were destroyed or damaged by fire or other accidental cause.
(4) You were trying very hard to find necessary information to support your claim but did not find the information within the stated time periods.
(5) You asked us for additional information explaining our action within the time limit, and within 60 days of receiving the explanation you requested reconsideration or a hearing, or within 30 days of receiving the explanation you requested Appeal Council review or filed a civil suit.
(6) We gave you incorrect or incomplete information about when and how to request administrative review or to file a civil suit.
(7) You did not receive notice of the determination or decision.
(8) You sent the request to another Government agency in good faith within the time limit and the request did not reach us until after the time period had expired.
(9) Unusual or unavoidable circumstances exist, including the circumstances described in paragraph (a)(4) of this section, which show that you could not have known of the need to file timely, or which prevented you from filing timely.

20 C.F.R. §§ 404.911, 416.1411.

[12]    HALLEX I-2-4-25B states that:

> To establish good cause for failure to attend a scheduled hearing, a claimant must show that neither the claimant nor the claimant's representative was properly notified of the scheduled hearing, or that an unexpected event occurred that did not provide them enough time in advance of the scheduled hearing to notify the ALJ and request a postponement

[13]    Social Security Administration, http://www.ssa.gov/OP_Home/hallex/hallex.html (last visited November 14, 2011).

Plaintiff acknowledges that he had advanced notice of his hearing date and location. (R. at 11 – 12). He received a Notice to Show Cause from the ALJ, and responded promptly. (R. at 11 – 12). He indicated that the night before his hearing he was to have been picked up by his father at his mother's home and transported to his home, near his counsel's office. (R. at 11 – 12). Counsel was to provide Plaintiff with a ride to the hearing therefrom. (R. at 11 – 12). Plaintiff's father did not arrive in the evening to pick Plaintiff up. (R. at 11 – 12). Plaintiff did not attempt to find alternate means of attending the hearing until the next morning when he contacted his counsel to inquire about postponing the hearing. (R. at 11 – 12). He then contacted his mother at her place of employment, but she was ultimately unable to help him. (R. at 11 – 12). Plaintiff also explained that as a result of his use of all pre-paid minutes on his cellular phone, he was not able to get into contact with his counsel when he had no other transportation options. (R. at 11 – 12).

The ALJ considered Plaintiff's reasons for missing his hearing, but determined that they did not constitute good cause. (R. at 15). Of primary importance was a lack of documentation from Plaintiff's parents and his cellular phone carrier attesting to the veracity of his alleged good cause. (R. at 15). It is also notable that Plaintiff made no attempt to address his transportation issues the night before his hearing after his father allegedly failed to pick him up. Based upon the record and the ALJ's reasoning, the Court finds that substantial evidence supported his conclusion that Plaintiff did not have good cause to miss his hearing, thereby constructively waiving his right to appear in-person. Plaintiff was not, therefore, denied due process. Additionally, the court notes that Plaintiff did have the benefit of his counselor's presence at the hearing to cross-examine the vocational expert. The ALJ also considered evidence submitted by Plaintiff following the hearing date regarding his alleged disability. (R. at 15).

**b. Objection as to Consideration of Doctors' Opinions**

Plaintiff argues that the ALJ did not properly consider the opinions of Drs. Simmons and Eisler, and did not discuss a GAF score of 45 that was assessed by Dr. Simmons and a GAF score of 30 that was assessed by Dr. Eisler. (ECF No. 8 at 14 – 17). The ALJ provided a thorough discussion of the record and the opinions of both doctors. As indicated by the ALJ, however, there were numerous inconsistencies between the medical record and the doctors' ultimate conclusions regarding Plaintiff's degree of limitation. As a result, the ALJ's determination that Dr. Simmons and Dr. Eisler's findings were not entitled to significant weight was supported by substantial evidence.

Dr. Simmons noted on several occasions that Plaintiff was temporarily disabled for periods of less than twelve months. Yet, he failed to provide any objective medical data for support. Dr. Eisler indicated that Plaintiff exhibited suicidal ideation and psychosis, but the record shows that just the opposite was observed over the course of Plaintiff's past treatment. Amongst all the evidence present in a claimant's medical record, treating physicians' opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physicians' findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

Here, Plaintiff's personal accounts of his ability to care for himself, engage in regular daily activities, and get along with others contradicted the findings of Drs. Simmons and Eisler.

In fact, Drs. Simmons and Eisler's findings were inconsistent with one another. The medical record shows that Plaintiff was generally non-compliant with treatment, when he was compliant he functioned well, his symptomology was generally less severe than indicated by Drs. Simmons and Eisler, his credibility with respect to his subjective complaints was questionable, and his periods of incarceration precluded him from engaging in substantial gainful activity for significant periods of time. Given this record, Plaintiff has not shown that Drs. Simmons and Eisler's findings were attributed less consideration than was merited. The ALJ bolstered his decision not only with objective medical evidence from the record, but also with Dr. Schiller's much less severe evaluation of Plaintiff's functional capacity. (R. at 18 – 22).

With respect to the GAF scores, in light of the failure of either doctor to explain the import of the scores, and given the ALJ's discussion of the written findings of each doctor which accompanied these scores, the court is not persuaded that his failure to explicitly mention each score was error requiring remand. A "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v. Astrue,* 351 Fed. Appx. 714, 715 – 16 (3d Cir. 2009) (citing 66 Fed. Reg. 50764-5 (2000)). While GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability. *Coy v. Astrue*, 2009 WL 2043491 *14 (W.D. Pa. Jul. 8, 2009) (citing *Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 383 (E.D. Pa. 2008)). The Court, therefore, will not remand so that the "ALJ can insert the GAF scores into his decision." *Coy*, 2009 WL 2043491 *14.

Finally, in light of the above discussion, it is clear that the ALJ provided a thorough analysis of the medical evidence underlying Plaintiff's claim for disability benefits. Having

provided significant record evidence to support his findings, this court can conclude nothing other than that all the credibly established medical impairments suffered by Plaintiff were properly incorporated into the hypothetical to the vocational expert by the ALJ, and were accommodated fully in the ALJ's RFC assessment. Therefore, the ALJ's hypothetical and RFC assessment were not flawed.

## C.    CONCLUSION

Based upon the foregoing, the ALJ provided a sufficient evidentiary basis to allow this court to conclude that substantial evidence supported his decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. ' 636(b)(1)(B) & (C), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

*s/ Maureen P. Kelly*
Maureen P. Kelly
United States Magistrate Judge

Dated: December 13, 2011

cc/ecf: All counsel of record.